**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

ANA FUENTES o/b/o R.M.,    :
  Plaintiff,       :    CIVIL ACTION
             :
  v.           :
             :
ANDREW SAUL,      :
Commissioner of Social Security,  :    No. 19-6151
  Defendant.      :

## MEMORANDUM OPINION

TIMOTHY R. RICE        November 12, 2020
U.S. MAGISTRATE JUDGE

   Plaintiff Ana Fuentes, on behalf of her daughter, R.M., filed an application for child's

Supplemental Security Income (SSI) under Title XVI of the Social Security Act, 42 U.S.C. §§

1381-83f, seeking benefits due to disabling depression, anxiety, and panic attacks that R.M. has

experienced since she was sexually abused by her stepfather.  R. at 432.  Fuentes now challenges

the final decision of the Commissioner of the Social Security Administration denying her claim.

Pl. Br. (doc. 12) at 1-23; Pl. Reply (doc. 16) at 1-10.  As explained below, the Administrative

Law Judge (ALJ) failed to support her analysis of functional equivalence with substantial

evidence and I remand the case for further consideration.[1]

## PROCEDURAL HISTORY

   Fuentes filed for SSI on behalf of R.M. on October 5, 2017.  R. at 404-13.  On November

15, 2018, the ALJ found that R.M. does not have an impairment that functionally equals the

---

[1]  Fuentes consented to the jurisdiction of a United States Magistrate Judge on December 30, 2019 (doc. 4), pursuant to 28 U.S.C. § 636(c), Fed. R. Civ. P. 72, Local Rule 72.1, and Standing Order, In re Direct Assignment of Social Security Appeal Cases to Magistrate Judges (Pilot Program) (E.D. Pa. Sept. 4, 2018).  See also Roell v. Withrow, 538 U.S. 580, 584 (2003) (consent to Magistrate Judge jurisdiction can be inferred from failure to object after notice and opportunity).

severity of the listings[2] and denied the claim.  Id. at 242-63.  Fuentes seeks review of the ALJ's

decision pursuant to 42 U.S.C. §§ 405(g) and 1383(c).  Id. at 1-7.

FACTUAL HISTORY

R.M. was 15 at the time of the October 2018 hearing, see R. at 268, 404, and was

diagnosed with major depressive disorder, anxiety disorder, and post-traumatic stress disorder

(PTSD).  She had been sexually abused by her stepfather.  See id. at 275-76, 1055, 1077.

Although it was reported when R.M. was almost 11 years old, the abuse had been ongoing since

R.M. was nine.  Id.  In 2016, R.M. began weekly therapy at Women Organized Against Rape

(WOAR).  Id. at 297, 1076, 1203-20, 1310-1406.  She also participated in individual, group, and

family therapy at The Wedge Medical Center (Wedge) beginning in 2016.  See id. at 1077, 1221-

1303.  Despite the trauma of sexual abuse,  R.M. continued to see her stepfather when he

dropped off her youngest brother.[3]  Id. at 275-76.  Such repeated contact with her stepfather re-

traumatized R.M.  See id. at 1291.

R.M. testified that her biggest barrier is anxiety and that she feels anxious "almost every

day" which causes her to rush, overthink things, and "blank out."  Id. at 273.  In June 2017,

---

[2]      For children, the Listing of Impairments describes impairments that cause marked and
severe functional limitations.  20 C.F.R. § 416.925.  See also 20 C.F.R. Pt. 404, Subpt. P, App. 1,
Part B (the listings for children).  If a claimant's impairment or combination of impairments
meets or is medically equal to the severity of a listed impairment, the claimant is deemed
disabled.  20 C.F.R. § 416.924(d)(1).

[3]      Fuentes and R.M.'s stepfather have a son together.  R. at 1085.  Although a restraining
order stopped his contact with R.M., R.M.'s stepfather still had contact with his son.  Id. at 1227.
In October 2017, R.M. reported to her doctor that seeing her stepfather made her anxious and she
shut herself in her room when he came to their home.  Id. at 1085.  The doctor noted that R.M.
was "sleeping a lot and her grades are suffering in school.  She has fun with her friends and is
happy when she is around them but that changes when she goes home."  Id.  R.M. admitted to
this doctor that "sometimes she lies to her therapist because she doesn't want to seem sad."  Id.

2

R.M. received emergency medical care for chronic, intermittent chest pains.  See id. at 986-92,

1068.  She was diagnosed with generalized anxiety disorder.[4]  Id. at 1068.

R.M. has a history of self-harm and began having suicidal thoughts when she was seven.

Id. at 1232.  In July 2017, when she was in the Philippines visiting family, R.M. overdosed on

her mother's pills and was admitted to the hospital for two days.  See id. at 275, 976-98, 1069-

70.  Therapy records show that in July 2018, R.M. had passive suicidal ideation after her mother

was hospitalized and that DPW became involved when Fuentes and R.M. had a fight.  Id. at

1329.  At the hearing, R.M. stated that she no longer hurt herself, but admitted that she cut

---

[4]     In her brief, Fuentes also referred to evidence regarding inpatient treatment R.M.
received for anxiety in February 2019.  See Pl. Br. at 15; see also R. at 8-236.  The
Commissioner correctly notes that this evidence was submitted after the ALJ's decision and does
not relate to the period at issue.  See Def. Br. at 5.  Evidence that was not before the ALJ cannot
be used to argue that the ALJ's decision was not supported by substantial evidence.  Matthews v.
Apfel, 239 F.3d 589, 594-95 (3d Cir. 2001).

Such evidence may be relevant only to determine whether it provides a basis for remand
under the sixth sentence of § 405(g).  Szubak v. Sec'y of Health and Human Servs., 745 F.2d
831, 833 (3d Cir. 1984).  To justify a remand under sentence six of § 405(g), the evidence must
be "new" and "material."  Id.  The "new" evidence must not be "merely cumulative of what is
already in the record" and must be "material" in that it must be relevant and probative.  Id.  "The
materiality standard requires that there be a reasonable possibility that the new evidence would
have changed the outcome of the Secretary's determination."  Id.  "An implicit materiality
requirement is that the new evidence relate to the time period for which benefits were denied,
and that it not concern evidence of a later acquired disability or of the subsequent deterioration of
the previously non disabling condition."  Id.  Furthermore, "remand based on new evidence is
only appropriate where the claimant shows good cause why that evidence was not procured or
presented before the ALJ's decision."  Chandler v. Comm'r of Soc. Sec., 667 F.3d 356, 360 (3d
Cir. 2011) (citing Matthews, 239 F.3d at 592-93).

I have not considered the evidence submitted by Fuentes after the date of the ALJ's
decision because it was not before the ALJ, and does not relate to the time period for which
benefits were denied.

herself in the past because she felt alone and had difficulty getting along with her mother.[5]  Id. at 273-74.  R.M. also hit her head or punched a wall when upset or angry; she told the ALJ that she no longer hit her head but admitted that she still sometimes punched things.[6]  Id. at 273-74, 1289.

In late 2017, R.M.'s school counselor contacted Fuentes because R.M. had confided to the counselor that she was engaging in self-harm.  Id. at 285.  Fuentes met with the counselor to address the self-harm and R.M.'s poor grades and inability to focus in school.  Id.  As a result, the counselor worked with Fuentes to establish a 504 plan for R.M. to provide additional assistance in school.[7]  Id.  The 504 plan, which became effective on February 28, 2018, provided R.M. with: (1) preferential seating in class; (2) extended time for tests, projects, and standardized tests; (3) use of the school's resource room for tests and quizzes; (4) use of the resource room during lunchtime until her grades improved; and (5) a daily report.  Id. at 644.

---

[5]     Fuentes clarified in her testimony, however, that the most recent cutting incident occurred only four months prior, in June 2018.  R. at 285.

[6]     Fuentes told the ALJ that she also has a history of sexual abuse, and that she and R.M. have received counseling together to address depression and other issues related to their abuse. R. at 288.  Fuentes stated that R.M. and she "were depressed at the same time" and that R.M. engaged in cutting when Fuentes did so as well.  Id.  The record shows that Fuentes attempted suicide in May 2017 and overdosed on pills again in December 2017.  See id. at 1265, 1374-78. R.M.'s therapists noted the negative impact of these situations on R.M.  See id.

[7]     The School District of Philadelphia, where R.M. was a student at the time, describes a 504 plan as a service agreement pursuant to Section 504 of the Rehabilitation Act of 1973.  See https://www.philasd.org/prevention/programs-and-services/504-service-planning/ (last visited November 10, 2020).  Its purpose is "to give students with disabilities the supports they need." Id.  A student's eligibility is evaluated and assessed before a plan is developed and implemented to meet the needs of the student.  Id.

In November 2017, R.M. underwent a mental status evaluation in connection with her application for benefits.  Id. at 1051-59.  At that time, R.M. was 14 years old and in the ninth grade.  Id. at 1051.  She was getting failing grades in school, but previously was a good student. Id.  R.M. reported to the evaluator, Dr. Christopher Patrone, that she experienced nightmares with frequent waking, decreased appetite, and difficulty eating, slept with her mother for comfort, and had difficulty concentrating and paying attention for two years.  Id. at 1052. R.M.'s depressive and mood-related symptoms included depressed or sad moods, loss of usual interest, concentration difficulties, irritability, and mood swings.  Id.  The anxiety-related symptoms included irritability, nightmares, exposures to trauma, and panic attacks.  Id.  Dr. Patrone found R.M. to be cooperative, with a coherent thought process.  Id. at 1053.  He deemed R.M.'s attention and concentration, and recent and remote memory skills, mildly impaired.[8]  Id. at 1054.

From December 2017 until the week before the October 11, 2018 hearing, R.M. lived in a shelter with her mother and two younger brothers.  Id. at 271-72, 284.  R.M. described the shelter as "not a good place" because they were not given enough food and she went to sleep hungry.[9]

---

[8]     R.M. was able to do some, but not all, simple calculations, and was able to perform serial 3s from 20, but not serial 7s from 100.  R. at 1053.  She was able to repeat three of three objects immediately, but only two of three after a delay.  Id. at 1054.  She could repeat four, five, and six digits forward, but not seven digits forward.  Id.  She was able to repeat three digits backward, but not four or five digits backward.  Id.

[9]     R.M. testified that she had gastrointestinal problems; she sometimes felt nauseated after eating.  R. at 271.  In May 2018, she sought treatment at the hospital for abdominal pain and was diagnosed with GERD.  Id. at 281, 1407-49.  While living at the shelter, R.M. was unable to eat healthy foods and mostly consumed spicy, salty food that she purchased from the corner store. Id. at 282.

In addition, R.M. experiences shortness of breath due to asthma.  Id. at 270.  Fuentes

Id. at 272.  She also testified that the "people there are really loud," the environment was "dirty," and she lacked friends there.  Id.

At the hearing, R.M. described feeling depressed and enduring crying spells twice a week.  Id. at 276.  She stated that she feels sad "almost all the time" and that she also feels angry and irritated.  Id. at 278.  She does not feel sad when she is with friends, but admitted that at times when she is sad while with them, she withdraws.  Id.  Fuentes also stated that R.M. lacked energy and frequently wanted to sleep when she came home from school.  Id. at 289.  Fuentes described R.M.'s mood as "angry all the time."  Id. at 290.  R.M. also testified that her memory is poor.[10]  Id. at 281.  In addition, R.M. has difficulty sleeping and experiences daily nightmares. Id. at 278-80.  R.M. sometimes seeks to sleep with her mother because she feels alone and unsafe.  Id. at 288-89.

R.M. informed the ALJ that she was prescribed Zoloft and other medication to alleviate nightmares but that she stopped taking her medication because it made her dizzy and nauseated.[11]  Id. at 281, 286.  Fuentes testified, however, that R.M. continued to experience nausea even after she stopped taking the medication.  Id. at 286.  At the time of the October 2018 hearing, R.M. no longer participated in individual therapy at Wedge due to transportation

_____

testified that R.M. uses an inhaler, but not as often as she should.  Id. at 291.  Fuentes has sought treatment at the hospital for R.M.'s breathing problems.  See, e.g., id. at 291, 979-82.

[10]     R.M. stated that she loses things and has recently lost two pairs of eyeglasses.  R. at 281. Fuentes confirmed that R.M. has memory problems and has a tendency to lose things.  Id. at 290.

[11]     Fuentes testified that R.M. stopped taking Zoloft because R.M.'s boyfriend advised her to do so.  R. at 285.  Fuentes explained that R.M.'s behavior changed somewhat when she began dating her boyfriend in that she suddenly was interested in attending school.  Id. at 287-88.  Prior to that, R.M. missed school frequently because she did not want to go.  Id. at 288.  School records show that during her freshman year of high school, R.M. was absent 24 days and tardy on 20 days.  See id. at 946.

problems.  Id. at 286-87.  Further, the Wedge family therapy stopped when Fuentes began working.  Id.  At the hearing, Fuentes also expressed concern about the amount of school that R.M. missed to attend therapy appointments.  Id. at 287.

R.M. described her school experience to the ALJ as "rocky."  Id. at 268.  Although the school year had just begun, she changed schools only a few days before the hearing after her family left the shelter.  Id. at 271-72.  R.M. stated that her grades were "fine" at that time, as she had earned two C's, but also noted that it was early in the school year.  Id. at 268.  R.M. confirmed that she has difficulty paying attention in class, especially in algebra class.  Id. at 269.  She explained that she dozes off and has trouble focusing.[12]  Id.  R.M. failed algebra in ninth grade and was retaking the class at the time of the hearing.  Id.  She stated that her grades in other classes were "okay" and "recently" she did not have difficulty completing homework.  Id.  R.M. acknowledged that she was given additional assistance through her 504 plan.  Id. at 270-71.  R.M. testified that she has friends at school and gets along well with teachers.  Id. at 269-70.

<u>DISCUSSION</u>

An individual under 18 is eligible for child's SSI if she has a "medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 1382c(a)(3)(C)(i).  The ALJ must decide whether the child: (1) is engaged in substantial gainful activity; (2) has a severe physical or mental impairment or combination of impairments; and (3)

---

[12]     WOAR therapy records show that one of R.M.'s symptoms was "dissociation in the form of frequently zoning out."  R. at 1211.  The goals of therapy included improving focus and decreasing dissociation in the classroom.  Id. at 1209.

has an impairment or combination of impairments that meets, medically equals, or functionally equals a listed impairment.   20 C.F.R. § 416.924(b)-(d).

To determine if the child's impairment functionally equals a listing, the ALJ evaluates how the child functions in her activities in terms of six domains: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for yourself; and (6) health and physical well-being.  Id. at § 416.926a(b)(1).  An impairment functionally equals a listing if the child has "marked" limitations in at least two domains, or an "extreme" limitation in at least one domain.[13] Id. at § 416.926a(a).  The ALJ will compare the child's functioning to children of the same age who do not have impairments, including how well the child initiates, sustains, and completes activities and how much help the child needs.  See id. at §§ 416.924a(b)(1)-(9); 416.926a(b).

The ALJ found at step one that R.M. had not engaged in substantial gainful activity.  R. at 248.  At step two, she determined that depression, anxiety, PTSD, and asthma/allergies were severe impairments.  Id.  At step three, the ALJ found that R.M. did not have an impairment or combination of impairments that met or medically equaled the severity of a listed impairment. Id. at 248-49.  Regarding functional equivalence, the ALJ found that R.M. had "marked" limitations in caring for herself, but "less than marked" limitations in attending and completing

---

[13]     A claimant will have a "marked" limitation when the impairment interferes seriously with the ability to independently initiate, sustain, or complete activities.  20 C.F.R. § 416.926a(e)(2). A child's day-to-day functioning may be seriously limited when the impairment limits only one activity or when the interactive and cumulative effects of the impairment limit several activities. Id.  An "extreme" limitation interferes very seriously with the ability to independently initiate, sustain, or complete activities.  Id. at § 416.926a(e)(3).  Although extreme limitations are "more than marked," they do not necessarily mean a total lack or loss of ability to function.  Id.

tasks, acquiring and using information, and health and physical well-being.[14]  Id. at 251-52, 254-57.  Because R.M. did not have a "marked" limitation in two domains or an "extreme" limitation in one domain, the ALJ found that her impairments did not functionally equal a listing.  Fuentes argues that the ALJ erred by: (1) finding less than marked limitations in the domain of attending and completing tasks; and (2) finding R.M.'s gastroesophageal reflux disease (GERD) diagnosis to be non-severe.  Pl. Br. at 9-23; Pl. Reply at 2-9.

I must accept all ALJ findings of fact that are supported by substantial evidence, meaning "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Morales v. Apfel, 225 F.3d 310, 316 (3d Cir. 2000); see also 42 U.S.C. § 405(g); Rutherford v. Barnhart, 399 F.3d 546, 553 (3d Cir. 2005) (substantial evidence is "more than a mere scintilla but may be somewhat less than a preponderance of the evidence").  I "review the record as a whole to determine whether substantial evidence supports a factual finding," Zirnsak v. Colvin, 777 F.3d 607, 610 (3d Cir. 2014), but may not "re-weigh the evidence or impose [my] own factual determinations," Chandler v. Comm'r of Soc. Sec., 667 F.3d 356, 359 (3d Cir. 2011).

Fuentes argues that substantial evidence does not support the ALJ's finding that R.M. has less than marked limitations in the domain of attending and completing tasks.  Pl. Br. at 12-18. She contends that the ALJ failed to consider all of the relevant evidence in the context of this domain, including the impact of the 504 plan.  Id. at 15-16; Pl. Reply at 5-7.  In addition, Fuentes argues that the ALJ failed to fully credit R.M.'s troubles with focusing and finishing activities in

---

[14]      The ALJ also found that R.M. had "no limitation" in interacting and relating with others, and moving about and manipulating objects.  R. at 253-54.

her analysis of this domain, despite having done so in the domain of caring for herself.  Pl. Br. at 9.

I agree.  The ALJ's analysis is internally inconsistent and not supported by substantial evidence.

The domain of attending and completing tasks considers a child's ability to focus and maintain attention, along with the ability to begin, carry through, and finish activities, including the pace.  See 20 C.F.R. § 416.926a(h).  A child of R.M.'s age without an impairment should be able to pay attention to increasingly longer presentations and discussions, maintain her concentration while reading textbooks, and independently plan and complete long-range academic projects.  Id. at § 416.926a(h)(2)(v).  The child should also be able to organize her materials and plan her time to complete school tasks and assignments.[15]  Id.

When analyzing this domain, the ALJ acknowledged R.M.'s "reported difficulty focusing in math and history classes, difficulty concentrating, as well as a general tendency to zone out."  R. at 252.  She found, however, that on mental status examinations, she showed a mild impairment in concentration, her thought process was coherent and goal-directed, and her thought content was normal.  Id.  The ALJ also noted the absence of a diagnosis of attention deficit disorder, and that R.M. had sufficient focus  to participate in clubs and assist with

---

[15]     Some examples of limitations in this domain include a child who: (i) is easily startled, distracted, or overreactive to sounds, sights, movements, or touch; (ii) is slow to focus on, or fail to complete, activities of interest, such as games or art projects; (iii) repeatedly becomes sidetracked from activities or frequently interrupts others; (iv) is easily frustrated and gives up on tasks, including ones the child is capable of completing; or (v) requires extra supervision to keep engaged in an activity.  20 C.F.R. § 416.926a(h)(3).

household chores.  Id.  The ALJ determined that such evidence demonstrates that R.M. has less than marked limitation in this domain.  Id.

Although the ALJ weighed R.M.'s lack of attention deficit disorder against her, the regulations fail to mandate that a claimant must be diagnosed with attention deficit disorder to have a marked or extreme limitation in attending and completing tasks.  Further, the ALJ failed to address how the psychiatric diagnoses affected her ability to attend and complete tasks.  For instance, R.M.'s 504 plan, which was designed to accommodate her mental impairments, gave R.M. preferential seating in class, extended time for tests, projects, and standardized tests, and use of the school's resource room.  Id. at 644.  Although the ALJ mentioned the 504 plan in her discussion of another domain, see id. at 252, the ALJ failed to address it in her analysis of attending and completing tasks.  The 504 plan is relevant to the domain of attending and completing tasks, which addresses a child's ability to begin, carry through, and finish activities, and the mental pace at which she performs.  See 20 C.F.R. § 416.926a(h)(v); Determining Childhood Disability-the Functional Equivalence Domain of "Attending & Completing Tasks", SSR 09-4p, 2009 WL 396033, at *2 (Feb. 18, 2009) ("We consider the child's ability to initiate and maintain attention, including the child's alertness and ability to focus on an activity or task despite distractions, and to perform tasks at an appropriate pace.  We also consider the child's ability to change focus after completing a task and to avoid impulsive thinking and acting.  Finally, we evaluate a child's ability to organize, plan ahead, prioritize competing tasks, and manage time.").  See also 20 C.F.R. § 416.926a(a)(1) (an ALJ must consider if the child needs extra help compared to children of the same age who do not have such limitations).

Moreover, R.M. consistently reported, and received therapy for, significant difficulties due to limitations caused by anxiety, depression, and PTSD, such as sleep difficulties, including nightmares, see, e.g., id. at 1227, 1235, 1240, 1263, 1279, 1327, 1354, 1360, 1385; difficulty concentrating, see, e.g., id. at 1225, 1227, 1236, 1240, 1268, 1289, 1320, 1365-66; difficulty sustaining attention, see, e.g., id. at 1228, 1328, 1335, 1338; and difficulty completing assignments, see e.g., id. at 1225, 1279.  Her symptoms were sufficiently severe and frequent to warrant medication until they were suspended due to adverse side-effects.  See id. at 1246, 1248, 1251.

As the Commissioner notes, I must determine whether the ALJ's decision as a whole is supported by substantial evidence.  See Jones v. Barnhart, 364 F.3d 501, 505 (3d Cir. 2004) (explaining that an ALJ is not required "to use particular language or adhere to a particular format in conducting his analysis" and the court should consider whether "there is sufficient development of the record and explanation of findings to permit meaningful review").  The Social Security Administration has adopted a "whole child" approach for determining whether a child's impairment functionally equals the listings.  Determining Childhood Disability Under the Functional Equivalence Rule-the "Whole Child" Approach, SSR 09-1p, 2009 WL 396031, at *1-13 (Feb. 17, 2009).  Under this approach, the ALJ considers the child's functioning without considering the domains or individual impairments.  Id. at *1.  An impairment may have effects in more than one domain and the ALJ must evaluate limitations caused by an impairment in any affected domain.  Id.  The ALJ must also "rate the severity of the limitations in each affected domain."  Id. at *2.  "This technique for determining functional equivalence accounts for all of the effects of a child's impairments singly and in combination -- the interactive and cumulative

effects of the impairments -- because it starts with a consideration of actual functioning in all settings." Id.

Viewed as a whole, the ALJ's analysis is inconsistent because it treats R.M's self-reported symptoms differently while analyzing different domains. In the domain of caring for yourself, the ALJ provided a detailed summary of the evidence, including R.M.'s difficulty concentrating and completing tasks. See R. at 255-56. For example, the ALJ acknowledged R.M.'s history of self-harm and sleeping problems, and noted that R.M. reported symptoms that included dissociation in the form of frequently zoning out, and difficulty concentrating. See id. at 255. The ALJ also considered the November 2017 consultative examination and highlighted R.M.'s reports of nightmares, sleeping with her mother for comfort, decreased appetite, "trouble paying attention and sustaining concentration in class and sometimes failing to follow through on instructions." Id. at 256.

R.M.'s reports of difficulty concentrating and completing tasks were considered and credited by the ALJ, and factored into the ALJ's conclusion that R.M. has a marked limitation in the domain of caring for yourself. See id. at 255-56. Yet the ALJ failed to fully credit that same evidence in the attending and completing tasks domain, where the assessment of these symptoms is particularly relevant, and failed to explain her reasons for doing so. An impairment may have effects in more than one domain, which requires the ALJ to evaluate the limitations in any affected domain. 20 C.F.R. § 416.926a(c). The ALJ's error is not harmless because a marked limitation in the domain of attending and completing tasks, along with the marked limitation in the domain of caring for yourself, would have rendered R.M. disabled.

Although the Commissioner offers additional reasons for the ALJ's "less than marked" finding in attending and completing tasks, that rationale was not used by the ALJ. <u>See</u> Def. Br. at 6-8.  I may not rectify errors made by an ALJ by making an independent analysis and relying upon information  not relied upon by the ALJ.  <u>Fargnoli v. Massanari</u>, 247 F.3d 34, 44 n.7 (3d Cir. 2001).  <u>See also</u> <u>Cortes v. Comm'r of Soc. Sec.</u>, 255 F. App'x 646, 653 (3d Cir. 2007) ("The grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based.") (quoting <u>SEC v. Chenery Corp.</u>, 318 U.S. 80, 87 (1943)).

Regardless, the Commissioner's supplemental rationale is unpersuasive.  The Commissioner argued that the ALJ's finding of less than marked limitations in attending and completing tasks is justified because R.M. was capable of taking the train herself.  <u>See</u> Def. Br. at 7.  WOAR therapy notes refute this.  Those notes demonstrate that R.M. had difficulty with time management by being consistently late to her therapy sessions.  <u>See</u> R. at 1321, 1324, 1330, 1331, 1337, 1340, 1343, 1356, 1357.  In light of the other undisputed evidence, the ability to commute by train cannot support the ALJ's finding of an ability to attend and complete tasks.

The Commissioner also argues that substantial evidence supports the ALJ's decision because R.M.'s grades improved in 2018.  <u>See</u> Def. Br. at 6 (citing R. at 252).  This claim is inaccurate, or at least incomplete.  Although R.M.'s grades showed some modest improvement in the third quarter of the 2017-2018 school year, her fourth quarter grades were poor.[16]  Further, in her discussion of acquiring and using information, the ALJ noted that "[i]n September 2018, she also reported that school was going well and she was excited and proud over better study

---

[16]    Her academic records show that R.M.'s final grades for ninth grade consisted of two Cs, four Ds, and two Fs.  R. at 949-50.

habits and good grades received (Exhibit 25F)." <u>Id.</u> at 252.  R.M. testified at the October 2018

ALJ hearing that her grades were "so far, fine," but also noted that it was only the beginning of

the school year.  <u>Id.</u> at 268.  Moreover, the ALJ's statement that "educational documentation . . .

shows her grades were improving overall during the latter half of 2018 (Exhibit 14E)" overstates

the evidence.  <u>Id.</u> at 252.  The record contains a school form that describes the trend of R.M.'s

grades in core courses as "improving."  <u>Id.</u> at 941.  However, the form was generated on October

10, 2018, and at most pertains to the first few weeks of the new, 2018-2019 school year, and

does not reflect R.M.'s grades "during the latter half of 2018" as described by the ALJ.  <u>See</u> <u>id.</u>

at 252, 941.

An ALJ must hear and evaluate all relevant evidence, <u>Cotter v. Harris</u>, 642 F.2d 700, 704

(3d Cir. 1981), and may not "reject evidence for no reason or for the wrong reason."  <u>Clinkscales</u>

<u>v. Colvin</u>, 232 F. Supp. 3d 725, 737 (E.D. Pa. 2016), <u>R&R Approved and Adopted</u>, 232 F. Supp.

3d (E.D. Pa. 2017).  <u>See also</u> 20 C.F.R. § 416.924a(a) ("We consider all relevant information

(<u>i.e.</u>, evidence) in your case record" in determining disability for children.).  Because the ALJ

failed to explain why she rejected conflicting, probative evidence, her decision is not supported

by substantial evidence and must be remanded.[17]

An appropriate Order accompanies this opinion.

---

[17]     Because I am remanding this case based on the ALJ's errors with the functional
equivalence analysis, it is unnecessary to address Fuentes' additional claim.  <u>See</u> <u>Steininger v.</u>
<u>Barnhart</u>, 2005 WL 2077375, at *4 (E.D. Pa. Aug, 24, 2005) (not addressing additional
arguments because ALJ may reverse his findings after remand).